UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF RHODE ISLAND
- - - - - - - - - - - - - - - - - -x

In re:                              :

KIMBERLY A. TEOLIS               :     BK No. 08-12131
              Debtor                         Chapter 12

- - - - - - - - - - - - - - - - - -x
In re:                              :

GLENN TEOLIS                     :     BK No. 09-10106
              Debtor                         Chapter 12

- - - - - - - - - - - - - - - - - -x


### DECISION AND ORDER DENYING MOTIONS TO DISMISS

APPEARANCES:

        Peter G. Berman, Esq.
        Attorney for Debtors
        RASKIN & BERMAN
        116 East Manning Street
        Providence, Rhode Island 02906

        Peter J. Furness, Esq.
        Attorney for Creditor, Meshanticut Valley Real Estate Inc.
        SINAPI FORMISANO & CO.
        100 Midway Place, Suite 1
        Cranston, Rhode Island 02920-5707

        Charles A. Pisaturo, Jr., Esq.
        Attorney for Creditor, Meshanticut Valley Real Estate Inc.
        LAW OFFICES OF CHARLES A. PISATURO JR.
        1055 Elmwood Avenue
        Providence, Rhode Island 02907

        John Boyajian, Esq., Trustee
        BOYAJIAN HARRINGTON & RICHARDSON
        182 Waterman Street
        Providence, Rhode Island 02906


**BEFORE ARTHUR N. VOTOLATO, United States Bankruptcy Judge**

BK Nos. 08-12131; 09-10106

Heard on the Motions of secured creditor Meshanticut Valley Real Estate, Inc., ("Meshanticut"), and the Chapter 13 Trustee ("Trustee"), seeking dismissal of the Chapter 12 cases of Glenn and Kimberly Teolis, (the "Debtors").  This dispute involves whether the Debtors' business activities constitute a farming operation under 11 U.S.C. § 109(f), et. seq., within which the Debtors would be eligible to reorganize their business.

### **TRAVEL**

On July 11, 2008, Kimberly Teolis filed a Chapter 13 case. When it became clear that the amount of the secured debt disqualified her from eligibility for Chapter 13, she moved to convert the case to one under Chapter 12.  Contending that she is not eligible to be a debtor under either Chapter, both Meshanticut and the Trustee moved to dismiss the Chapter 13 case and objected, as well, to the Motion to Convert to Chapter 12. In January 2009, Glenn Teolis filed his own Chapter 12 case. To assist procedurally, the Movants withdrew their objection to the conversion of Kimberly's case to Chapter 12, reserving and exercising their right to proceed with Motions to Dismiss both Chapter 12 cases. A consolidated hearing on both Motions to Dismiss was held on April 23, 2009.

BK Nos. 08-12131; 09-10106

## BACKGROUND[1]

In January 2007, the Debtors purchased the premises at 495 Phenix Avenue, Cranston, Rhode Island (the "Property"), from Meshanticut for $720,000. Meshanticut financed the entire purchase price, and is the first mortgage holder. The Teolises also purchased, for $70,000, the assets of the prior occupant of the Property, Jim Russell Enterprises, Inc., which had operated as the Fire House Nursery. Glenn Teolis formed the T-Co Depot, Inc. ("T-Co"), as the legal entity which would own and operate the new business, and he owns 100% of the stock of the corporation and is its only officer/director. From its inception, the business had financial problems, and in October 2008, T-Co Depot, Inc.'s corporate charter was revoked by the Rhode Island Secretary of State. Since the revocation of the charter, the Debtors have continued to operate the business as a d/b/a called T-Co Depot Landscape & Garden Center (also "T-Co"). T-Co has a current Nursery Worker's License, issued by the Rhode Island Department of Environmental Management.

The Debtors describe their operation mainly as growing and selling plants and trees, including vegetables, shrubs and flowering plants. (Debtor's Post Hearing Brief; Doc. No. 201, at

---

[1] This Opinion constitutes the findings of fact and conclusions of law required by Fed. R. Civ. P. 7052 and Fed. R. Bankr. P. 9014.

BK Nos. 08-12131; 09-10106

1). Glenn testified that in 2008 T-Co's gross sales were $298,303, and of that amount, the gross income from the sale of farm products was $179,531.[2] Although the Movants remain skeptical, the Debtors' figures have not been impeached or challenged in any way. Glenn owns a 2006 Chevrolet dump truck that he uses in the business, as well as unspecified "inventory" valued at $20,000. Jointly, the Debtors owe Meshanticut $770,000, and Kimberly has $34,767 in personal unsecured debt. In addition to her obligation to Meshanticut, Kimberly is liable on the first and second mortgages on the family home, for approximately $580,000. (Debtor's Ex. C, Schedule D.) Glenn also owes approximately $70,000 on two auto loans (Meshanticut Ex. 6, Schedule D), and $201,727 in other unsecured debt.

### THE ISSUES

The broad issue in this case of first impression, I think, in the First Circuit, is whether the business conducted by the Teolises qualifies them as family farmers eligible to be Debtors under Chapter 12 of the Bankruptcy Code. 11 U.S.C. § 109(f).

---

[2] While T-Co derives income from other related sources, the revenue from such sales and services is not included as income from the farming operation.

4

BK Nos. 08-12131; 09-10106

## THE APPLICABLE LAW

"Only a family farmer ... with regular annual income may be a debtor under chapter 12" of the Bankruptcy Code. 11 U.S.C. § 109(f). A *family farmer* is defined as:

> [an] individual *or individual and spouse* engaged in a farming operation whose aggregate debts do not exceed $3,544,525 and not less than 50 percent of whose aggregate noncontingent, liquidated debts (excluding a debt for the principal residence of such individual or such individual and spouse unless such debt arises out of a farming operation), on the date the case is filed, arise out of a farming operation owned or operated by such individual or such individual and spouse, and such individual or such individual and spouse receive from such farming operation more than 50 percent of such individual's or such individual and spouse's gross income for –
>> (I) the taxable year preceding; or
>> (ii) each of the 2d and 3d taxable years preceding the taxable year in which the case concerning such individual or such individual and spouse was filed.

11 U.S.C. § 101(18)(emphasis supplied).

Since consideration of the issues raised in this dispute are largely *definition-based*, I will engage in a definition-based, one-sided discussion of several of said issues.

"The term 'farming operation' includes farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state." 11 U.S.C. § 101(21). As this is not an exclusive list, other activities not specifically mentioned may also qualify as *farming operations*. *In re Watford*,

5

BK Nos. 08-12131; 09-10106

898 F.2d 1525, 1527 (11th Cir. 1990). The definition should be construed liberally, *id.*, but at the same time "it cannot be so broadly applied as to bring in operations clearly outside the nature or practices one normally associates with farming." *In re Dakota Lay'd Eggs*, 57 B.R. 648, 653 (Bankr. D. N.D. 1986). Ultimately, each case should be decided on its own unique facts. *In re Buckingham*, 197 B.R. 97, 103 (Bankr. D. Mont. 1996).

With the enactment in 1986 of Chapter 12 of the Bankruptcy Code,[3] it appears that two main methods have evolved in determining whether a particular enterprise constitutes a *farming operation*. One view concentrates on whether the operation is subject to "traditional risks of farming," *In the Matter of Armstrong*, 812 F.2d 1024, 1028 (7th Cir. 1987), while the other employs a "totality of the circumstances" test, of which *risks of farming* is but one factor to be considered. *Watford,* 898 F.2d at 1528-1529. The *Armstrong* approach has been criticized as being too narrowly focused, which may result in the exclusion of some debtors whom Congress intended to protect. *Id.; see also In re Hettinger*, 95 B.R. 110, 111-112 (Bankr. E.D. Mo. 1989); *In re Coulsten*, 98 B.R. 280, 281-282 (Bankr. E.D. Mich. 1989); *In the Matter of Burke*, 81 B.R. 971, 976 (Bankr. S.D. Iowa 1987); *In re Mikkelsen Farms, Inc.*,

---

[3] The Bankruptcy Judges, United States Trustee, and Family Farmer Bankruptcy Act, Pub. L. No. 99-554, § 255, 100 Stat. 3088 (1986).

6

BK Nos. 08-12131; 09-10106

74 B.R. 280, 284-285 (Bankr. D. Or. 1987).   I agree with the

critical (of *Armstrong*) opinions, and will follow the "totality of

the circumstances" line of cases discussed below.

Courts considering *the totality of the circumstances* approach

have discussed a variety of non-exclusive factors, including:

1. The location of the operation;

2. The nature of the enterprise;

3. The type of product and its eventual market;

4. The physical presence or absence of family members at the

property;

5. Ownership of traditional farm assets;

6. Whether the owners are engaged in the process of growing or

developing crops or livestock; and

7. Whether the operation is subject to the *inherent risks of

farming*.

*See In re Osborne*, 323 B.R. 489, 494 (Bankr. D. Or. 2005).

## DISCUSSION

**A.   Totality of the circumstances analysis.**

    **1. *The location of the operation*.**

The subject Property is within a one mile radius of a high

school, a middle school, tennis courts, a police training firing

range, and presumably pharmacies, convenience and fast food stores,

auto repair and fuel services, and all of the standard retail

BK Nos. 08-12131; 09-10106

amenities.  In other words, the neighborhood is mixed/suburban, rather than rural in character.

In Rhode Island, as geographically compact and densely populated as it is, the development of neighboring agricultural and suburban land uses has rendered them less and less exclusive of each other.  For example, Rhode Island enacted the "Right to Farm Act," to "promote an environment in which agricultural operations are safeguarded against nuisance actions arising out of conflicts between agricultural operations and urban land uses."  R.I. Gen. Laws 1956 § 2-23-3.  Under the circumstances of our case, this expression of legislative intent weighs in favor of construing the Debtors' business as a farming operation.

**2. *The nature of the enterprise*.**

Whether a particular activity constitutes farming, is an issue of fact which should be decided on its own unique circumstances. *Buckingham, supra* at 6.  Our research has turned up no Rhode Island state or federal cases addressing whether a nursery/garden supply business may be considered a "farming operation" within the meaning of the Bankruptcy Code.  In the absence of local judicial guidance on the subject, I think it is appropriate to examine certain related state and federal statutes, even though such legislation may not be strictly *in pari materia*.  *Dakota Lay'd Eggs*, 57 B.R. at 654.

8

BK Nos. 08-12131; 09-10106

With the foregoing comments as a harbinger of which direction this decision is going, we begin with the federal Fair Labor Standards Act, 29 U.S.C. § 201, et. seq., where the court held that employees of a nursery which imported tree seedlings, performed grafting procedures, planted, cultivated, and then sold the trees after they had developed sufficiently, were engaged in agriculture.[4] *Jordan v. Stark Bros. Nurseries & Orchards Co.*, 45 F. Supp. 769, 771 (W.D. Ark. 1942). On the other hand, where the enterprise purchased nursery stock, simply stored and then resold it, the employees were not engaged in agriculture. *Id.*

Similarly, the *agriculture* exemption from the minimum wage and maximum hour requirements under § 213(a)(6) of the Fair Labor Standards Act was held to apply to employees of a nursery business who worked with nursery stock grown on its own turf, but would not apply to stock purchased from other growers for immediate sale. *Wirtz v. Jackson & Perkins Co.*, 312 F.2d 48, 50-51 (2d Cir. 1963). Another court held that although a nursery operation was a farm, to the extent it grew its own stock, certain of its employees who were engaged only in processing (i.e., unloading, sorting, grading, trimming, storing, racking and picking) nursery stock received from other sources mainly for resale, were not farm workers. *Mitchell*

---

[4] "Agriculture", under that statute, "includes farming in all its branches." 29 U.S.C. § 203(f).

9

BK Nos. 08-12131; 09-10106

*v. Huntsville Wholesale Nurseries, Inc.*, 267 F.2d 286 (5th Cir.

1959).

The term *farm* specifically includes *nurseries* under both the

Social Security Act, see 42 U.S.C. § 410(g), and the Internal

Revenue Code. *See* 26 U.S.C. §§ 3121(g), 263A(e)(4)(B)(ii),

2032A(e)(4), and 6420(c)(2).  Consistent with the federal labor

cases cited above, the IRS has explained, with respect to nursery

growers that:

> Under §263A(d), enacted by the Tax Reform Act of 1986,
> the farming exception to the uniform capitalization rules
> is available for certain plants "produced" (e.g. grown)
> in a farming business. Thus, the regulations permit
> nursery growers using the farming exception to deduct the
> costs of seeds and young plants purchased for further
> development and cultivation prior to sale, as well as the
> costs of growing the plants. *Under the regulations,*
> *nursery growers using the farming exception are permitted*
> *to deduct these costs even if the plants are partly grown*
> *by another person or are grown by the nursery in*
> *temporary containers. Because the statutory exception*
> *only applies to the costs of plants "produced" in a*
> *farming business, the exception cannot be used for costs*
> *incurred by a taxpayer in activities in which the*
> *taxpayer does not grow plants, but merely buys and*
> *resells plants grown entirely by others.*

Announcement 97-120, 1997 - 50 I.R.B. 61, 1997 WL 737316 (emphasis

added).

The combined import of these discussions of federal statutes

is that where a business buys, then merely resells or "flips" crops

grown entirely by others, the operation is not considered farming.

On the other hand, if a nursery buys seedlings or young plants and

BK Nos. 08-12131; 09-10106

cultivates them into a more mature product for eventual sale, such an operation may be considered a farm.

Locally, the Rhode Island Nursery law specifically provides that "all persons engaged in operating a nursery are farmers and are engaged in an agricultural enterprise for all statutory purposes." R.I. Gen. Laws 1956 § 2-18.1-2(11). Under the Taxation of Farm, Forest, and Open Space Land Act, "farmland" is land actively devoted to agricultural or horticultural use, including "nursery, floral and greenhouse products." R.I. Gen. Laws 1956 § 44-27-2(1)(ii). The same definition is found in the Animals and Animal Husbandry Law, R.I. Gen. Laws 1956 § 4-24-7. Again, I believe these statutory examples lend solid support to the conclusion that the Debtors' business operation constitutes farming.

Glenn Teolis explained that because the T-Co property "is wet and contains ledge," most of the *growing* is done above ground in containers, rather than planted in the soil. He also described, as follows, the processes generally conducted at the property: (a) In containers, T-Co starts seedlings of tomato plants, lettuce, herbs, etc., grows them indoors under regulated temperatures, then when sufficiently mature, sells the plants. On average, vegetable plants need to be repotted three times before sale; (b) T-Co purchases young trees and shrubs, then fertilizes, waters, trims,

11

BK Nos. 08-12131; 09-10106

prunes, and repots them into larger containers as required during the growing process.  When appropriate, the inventory is sold to landscaping businesses, homeowners, and gardening contractors; (c) T-Co starts flowers indoors from seed, in pots and trays, under high-output lights (simulating sunlight) while maintaining proper temperatures.  Seedling flowering plants require water twice daily, fertilizer, and eventually are moved into natural sunlight.  T-Co also purchases flowers in 6-inch pots, and cultivates them into 12-inch hanging baskets or pots.  These plants are grown for at least 2 months, and for as many as 6 months before sale.  Glenn testified that in his experience it is not possible to make a profit by buying and simply reselling plants, without growing them into a more mature product.  That process requires pruning, trimming, fertilizing, watering, and otherwise caring for them on a regular basis, and this, no doubt, is the sweat equity that hopefully creates profit.

Based on this factor as well, the nature of the Debtors' enterprise bodes well for them to be Chapter 12 Debtors in this Court.

12

BK Nos. 08-12131; 09-10106

3. *The type of product and its eventual market*.

Not surprisingly, farmers produce things agrarian in nature, *In re Maike*, 77 B.R. 832, 839 (Bankr. D. Kan. 1987), and included as farm products are fruits, vegetables, flowers, seeds, grasses, trees, etc.   3 Am. Jur. 2d Agriculture § 2.   Based on the discussion in the preceding section, and the federal and Rhode Island statutes discussed, it would likely be an abuse of discretion to rule that either or both of these Debtors are not family farmers.

4. *The presence (or absence) of family members at the Property.*

Glenn Teolis works full time at T-Co, managing the operation, keeping records, performing customer service, manual labor, deliveries, etc., and Ms. Teolis covers the same things if her husband is not available.   Relatives including Glenn's father, Kimberly's father, and cousins and in-laws have also "volunteered and helped out, in return for a free meal."

That no family member resides at the Property is not relevant in considering whether the Debtors' business constitutes farming. See Section 101(18) of the Code, which specifically excludes debt secured by the family residence from the calculation of the Debtors' farm debt. *See In re Henderson Ranches,* 75 B.R. 225, 226 (Bankr. D. Idaho 1987).   I conclude, therefore, that a debtor may

13

BK Nos. 08-12131; 09-10106

have a separate homestead and qualify to be a family farmer, provided the other eligibility requirements of the Bankruptcy Code are met.

**5. *Ownership of traditional farm assets*.**

Although *farm assets* is not a defined term in the Bankruptcy Code, courts have held that, included within the statute are loaders, tractors, trucks, irrigation systems, harrows, tillers, etc. *Mikkelsen Farms, Inc*. 74 B.R. at 282-85.

Even though neither Debtor listed specific items of "equipment," Glenn did lump together $20,000 worth of "inventory" in his Schedule B, and testified that the category included miscellaneous hand tools, potting utensils, tiller, shovels, wheelbarrow, "John Deere" weed cutter, lawn mower, and many of the items seen in the average home gardener's garage or yard shed.[5]  T-Co also uses a Kubota tractor, which at the time of the filing was held in the name of Glenn's cousin, Al Teolis.  Glenn was making the monthly payments of $430.77, either to Kubota directly or to his cousin Al, and such an entry appears on his Amended Schedule of Business Income and Expenses attached to Schedule J, under "Equipment Rental and Leases." Glenn, who owns all of the nursery

---

[5] With the parties and/or their representatives in attendance, a pre-trial view of the Property disclosed many of the items seen at a typical Rhode Island tree and plant *nursery*. Also predictably, we did not see any International Harvester combines or other heavy or automated farm machinery on the Property.

14

BK Nos. 08-12131; 09-10106

stock, clearly meets the Code's eligibility requirements under this factor.

**6. *Whether the Debtors are engaged in the process of growing or developing crops?***

While the Bankruptcy Code does not define "crops," the term has been discussed by courts, in various context including its statutory construction, as illustrated by these summaries in legal encyclopedia:

> "Crops" has been defined as products that are grown, raised, and harvested. Thus, a "crop" includes plants that can be grown and harvested extensively for profit or subsistence, in other words, for income or as source of food.

21A Am. Jur. 2d Crops § 1 (citations omitted).

> The word "crops," in its more general signification, means all products of the soil that are grown and raised annually and gathered during a single season, although definitions containing the term "annual" have been criticized as imposing too narrow a limitation.

25 C.J.S. Crops § 1 (citations omitted).

One court opined that "crops" includes fruits and products of plants, trees and shrubs, but not the plants, trees and shrubs themselves. *Adcock v. Berry*, 21 S.E.2d 605, 609 (Ga. 1942)(construing a Georgia statute). This decision is included to illustrate the diversity of results among courts considering this issue, and not so much for its rationale or conclusion. A more recent decision held that, for UCC Article 9 purposes, nursery plants are normally considered *crops* until they reach maturity,

15

BK Nos. 08-12131; 09-10106

whereupon they become "inventory." *In re Hill*, 83 B.R. 522, 524-525 (Bankr. E.D. Tenn. 1988). Trees have been held to be crops, and the harvesting of timber to be a "farming operation," in *In re Sugar Pine Ranch*, 100 B.R. 28, 32 (Bankr. D. Or. 1989). Similarly, nursery stock was considered crops for the purpose of assessment of damages for the condemnation of private land, in *Shelby County v. Adams*, 15 Tenn. App. 66, 1932 WL 1301, *4 (Tenn. App. March 3, 1932).

As these rulings illustrate, there is no hard or uniform definition of *crops*, but given reasonable construction, the provisions concerning eligibility for relief under Chapter 12, support the conclusion that the trees, shrubs, and flowering and vegetable plants grown by T-Co in their various stages of maturity are *crops,* in the context of this discussion.

**7. *Whether the operation is subject to the inherent risks of farming?***

While I fail to see the logic, some courts apparently still consider this to be, if not the only factor, one of the more important ones in the analysis. *See Osborne*, 323 B.R. at 494. I agree with the reasoning of the Eighth Circuit that "farm income" turns "not upon any risk of non-payment [the Debtor] might have faced, ... but rather upon the extent to which the income in question bears the relation to his farming activities prescribed by

16

BK Nos. 08-12131; 09-10106

the word of the statute." *In re Easton*, 883 F.2d 630, 633 (8th Cir. 1989).   Consider also that many non-farm businesses face the same risks of damaging weather and unstable markets, regardless of the nature of their operation.   For example, it would not be reasonable to extend Chapter 12 protection to a lessor of farmland (who is not involved in the farm operation), simply because his expectation of payment depends upon many of the same weather or economic risks facing the tenant farmer.   *In re Tim Wargo & Sons, Inc.*, 74 B.R. 469, 473-474 (Bankr. E.D. Ark. 1987).   This is why I prefer the view that the nature of a debtor's activity, in the totality of the circumstances, is a more meaningful indicator of what is a "farming operation," than limiting the inquiry to the economic risks to which the activity is vulnerable.

Nevertheless, in the event that, on appeal, the *farm risk factor* is determined to be the applicable standard in this case, it will be given equal time in this analysis.   Some of the risks associated with traditional farming are drought, flood, disease or insect infestation, frost, and fluctuating crop prices.   *Osborne*, 323 B.R. at 490; *In re Showtime Farm, Inc.*, 267 B.R. 541, 543 (Bankr. E.D. Tex. 2000); *In re Martin*, 78 B.R. 593, 597 (Bankr. D. Mont. 1987). *Matter of Krumm*, 87 B.R. 76, 77 (Bankr. D. Neb. 1988).

In the present case, T-Co's products are probably vulnerable to certain or all of these risks, and Rhode Island, in addressing the

17

BK Nos. 08-12131; 09-10106

pest/disease issue, requires all nurseries to be inspected and certified to be free of certain pest infestation and disease. R.I. Gen. Laws 1956 § 2-18.1-6(a). One purpose of this regulation is to protect the value of the products of such operations by curtailing the spread of disease or insects. *See* R.I. Gen. Laws 1956 § 2-16-3(1), and T-Co has submitted in evidence a current certificate of inspection. (Debtors' Exhibit D). Thus, it appears that the Debtors' operation is subject to many of the risks of nursery/garden operations.

Based upon the totality of the circumstances present in this case, the Debtors' business constitutes a "farming operation" for the purposes of Chapter 12.

**B. The following requirements under 11 U.S.C. § 101(18)(A) must also be satisfied.**

**1. *Maximum aggregate debt.***

The Debtors' aggregate secured and unsecured debt is slightly more than $1,540,000, therefore, the Debtors' total debt does not exceed the statutory limit of $3,544,525 to qualify as family farmers. *See* 11 U.S.C. § 101(18)(A). No further discussion of this factor is necessary.

18

BK Nos. 08-12131; 09-10106

**2. *Debt arising out of farming operations.***

The criteria for determining whether debt arises out of a farming operation are: (1) the reason or purpose for which the debt was incurred, and (2) the use to which the borrowed funds were put. *In re Douglass*, 77 B.R. 714, 715 (Bankr. W.D. Mo. 1987). The Debtors owe Meshanticut $770,000, all of which was borrowed to acquire the real estate on which T-Co's business is conducted. Without the loan, the Debtors would not own this land, and "but for the land, there would be no farm." *In re Reak*, 92 B.R. 804, 806 (Bankr. E.D. Wis. 1988).

The Debtors' combined scheduled debt (excluding the mortgage on their residence), is approximately $1,100,000. (Debtors' Ex. C; Meshanticut Ex. 6). Their obligation to Meshanticut – $770,000 – is more than 50% of their total debt. Therefore, the Debtors clearly meet this test for Chapter 12 eligibility. *See* 11 U.S.C. § 101(18)(A).

**3. *Debtors' minimum gross income.***

Glenn Teolis filed his Chapter 12 case in 2009, therefore, the relevant inquiry in his case is whether, in 2008, he received more than 50% of his gross income from farming operations. *See id.* In 2008, all of Glenn's income came from T-Co. However, not all of T-Co's income is derived from a "farming operation," i.e., the Debtors concede that the sale of sod, mulch, loam, stone, Christmas

19

BK Nos. 08-12131; 09-10106

trees, and its snow plowing and sanding services do not constitute farming. The evidence is that T-Co's *farm revenue, i.e.,* the sale of trees, shrubs, and flower and vegetable plants in 2008 was $179,531, while the non-farming portion of T-Co's income for the same period was $118,772. (Debtors' Ex. H). The Movants have offered nothing to controvert this evidence or the accuracy of Glen Teolis' testimony or records, but they argue that it would be difficult or impossible to independently verify its veracity. The figures, albeit not as precise as the Movants would like, are adequate to support the finding that more than 50% of the Debtors' 2008 income was derived from T-Co's farming operation.

As Glenn's spouse, Kimberly is eligible, as a matter of law, to file her own Chapter 12 case even if she earned no income from T-Co. The Bankruptcy Code repeatedly describes a family farmer as *an individual or individual and spouse*, 11 U.S.C. § 101(18)(A), and spouses are not required to file a Chapter 12 petition jointly in order to qualify for reorganization as *family* farmers. *In re Plovish*, No. 92-32371, 1992 WL 12148527 *3 (E.D. Va. Nov. 4, 1992). Although she is the homemaker and full-time care giver of the Debtors' four children, Kimberly is sufficiently involved in T-Co's operation, both in fact and as a statutory matter. Although not presently drawing a salary, she regularly helps out in the business as discussed at length in Court within these proceedings. A

20

BK Nos. 08-12131; 09-10106

farmer's spouse who worked as a teacher to supplement the farm's income was eligible to file either a separate Chapter 12 case or a joint case with her husband where the debtors jointly owned the property, and the spouse was personally involved in the work at the farm. *In re Welch*, 74 B.R. 401, 405 (Bankr. S.D. Ohio 1987).

Finally, the Movants' comment that in their 2007 federal tax return the Debtors did not file a Schedule F - "Profit or Loss from Farming," is neither determinative nor helpful on the question of whether the Debtors' business is or is not farming. *In re Buchanan*, No. 2:05-0114, 2006 WL 2090213 *3 (M.D. Tenn. July 25, 2006); *Cottonport Bank v. Dichiara*, 193 B.R. 798, 805 (W.D. La. 1996); *In re Wolline*, 74 B.R. 208, 210 (Bankr. E.D. Wis. 1987).

Based on the foregoing discussion and analysis of the Debtors' business operation, the applicable statutory and case law, and using the totality of the circumstances as the applicable standard, I find as a fact and conclude as a matter of law that both Debtors qualify as family farmers, and that Meshanticut's and the Trustee's Motions to Dismiss should be, and hereby are **DENIED**.

Dated at Providence, Rhode Island, this       26th       day of October, 2009.

_____
Arthur N. Votolato
U.S. Bankruptcy Judge

Entered on docket: 10/26/2009

21